UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-20424-CIV-SCOLA/GOODMAN

VERONICA MESA,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON SUMMARY JUDGMENT MOTIONS

      This case challenges a denial of social security benefits. Plaintiff Veronica Mesa and Defendant Kilolo Kijakazi[1], Acting Commissioner of the Social Security Administration ("Commissioner"), filed cross-motions for summary judgment. [ECF Nos. 20; 25]. The Commissioner's summary judgment motion also served as her opposition response to Mesa's motion. [ECF No. 26]. Mesa filed a response in opposition. [ECF No. 27]. Neither party filed an optional reply. According to the Clerk's directive in these types of administrative appeals, all dispositive matters have been referred to the Undersigned for a Report and Recommendations. [ECF No. 2].

---

[1]     Plaintiff's initial suit was brought against Andrew Saul, the Commissioner at the time of filing. Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the suit's Defendant.

As explained below, the Undersigned **respectfully recommends** that the District Court **deny** Mesa's summary judgment motion, **grant** the Commissioner's summary judgment motion, and enter a final judgment in favor of the Commissioner.

## I.      Procedural Background

On July 27, 2018, Mesa applied for supplemental security income, alleging a disability with an onset date of January 1, 2018.[2] (R. 217; 259).[3] Mesa alleges disability due to thinning of the splenium, ADHD, asthma, post-concussion syndrome, and "low blood." (R. 270). The Commissioner denied the application initially and on reconsideration. (R. 110-17). After a hearing on September 3, 2020 (R. 15), Administrative Law Judge Laura Bernasconi (the "ALJ") concluded that Mesa was not disabled. (R. 25). The Appeals Council denied review of the ALJ's decision. (R. 1-9). The Commissioner's final decision is now subject to review.

## II.      Factual Background

Mesa was 43 years old on the alleged onset date of January 1, 2018. (R. 15; 37). Mesa is a high school graduate and has some college credits. (R. 37). Mesa worked as a file clerk in the court system from April 1, 2001 through November 2017. (R. 37; 271). At the time

---

[2]      Mesa's initial application references a disability onset date of November 4, 1974, which is the same date she was born. (R. 217). Later documents reveal that the correct date is January 1, 2018. (R. 259).

[3]      Citations to ("R. __") refer to pages of the administrative record transcript. [ECF No. 22].

of her application, Mesa had been working part-time as a cashier for approximately three months. (R. 271). Mesa lives with her sister. (R. 42). She will sometimes help her sister with chores or accompany her if she is leaving the home. *Id.* Most of the day, Mesa reads or watches TV. *Id.* Mesa is able to drive but must use the GPS to prevent herself from getting lost. (R. 40).

Mesa claims she suffered a concussion caused by a car accident in 2008. (R. 38-39). Her symptoms began worsening in 2018 and she suffers from repeat headaches, anxiety, forgetfulness, asthma, high blood pressure and sleep apnea. (R. 28-41).

In her own words, Mesa states that she can't work anymore because she "can't concentrate . . . get[s] headaches all the time[,] . . . need[s] to lie down in a dark room for a period of time so [she] can focus again . . . can't function . . . [and] can't pay attention." (R. 38).

## III.   Applicable Legal Standards

### A.   *Standard of Review*

In evaluating a claim for disability benefits, an ALJ must follow the five steps outlined in 20 C.F.R. §§ 416.920(a) and 404.1520, which the Undersigned summarizes as follows:

1. **Step one**. Is the claimant performing substantial gainful activity? If not, then an ALJ next determines:

2. **Step two**. Does the claimant have one or more severe impairments? If the claimant does, then an ALJ next considers:

3.    **Step three**. Does the claimant have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled; if not, then an ALJ must determine the claimant's residual functional capacity ("RFC"); and then determine:

4.    **Step four**. Based on the RFC, can the claimant perform his or her past relevant work? If so, then the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then an ALJ must finally determine:

5.    **Step five**. Based on the claimant's age, education, and work experience, and the RFC, can he or she perform other work? If so, then the claimant is not disabled. If not, then the claimant is disabled and entitled to benefits.

*See Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

The claimant bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). In reviewing the decision, the Court must consider the record as a whole and determine whether the ALJ applied the correct legal standard and whether substantial evidence in the record supports her findings of fact. *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Phillips*, 357 F.3d at 1240 n.8 (internal citation omitted).

The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal citation omitted). And "[i]f the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it."

*Id.* (internal citation omitted).

The Court is authorized to enter a judgment affirming, modifying, or reversing the decision of an ALJ, with or without remand. 42 U.S.C. § 405(g); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 n.13 (11th Cir. 2000).

## IV.   The ALJ's Findings

In denying Mesa's claim for benefits, the ALJ followed the sequential five-step evaluation process for social-security claims. (R. 15-25). At step one, the ALJ concluded that Mesa had not engaged in substantial gainful activity since January 1, 2018, the alleged onset date. (R. 17).

At step two, the ALJ concluded that Mesa had the following severe impairments: degenerative changes of the cervical spine; obesity; status post-concussion with residual neurocognitive impairment; attention deficit hyperactivity disorder (ADHD); and anxiety. (R. 18).

At step three, the ALJ concluded that Mesa did not have an impairment or combination of impairments classifiable as a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18-20). Next, the ALJ determined that Mesa has the RFC to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except simple, routine, repetitive tasks with no production requirements with only occasional decision-making required with few, if any, workplace changes. The claimant is limited to occasional interaction with co-workers and supervisors but should not work on teams or in tandem with others and can have no public interaction. The claimant would be off task less than 10 percent of the time.

(R. 20).

At step four, the ALJ concluded that Mesa had no past relevant work experience. (R. 24).

Lastly, at step five, the ALJ found that there are jobs existing in significant numbers in the national economy that Mesa can perform, including produce weigher, cleaner & polisher, and marker. (R. 24-25). Accordingly, the ALJ found that Mesa has not been under a disability from January 1, 2018, through the date of the ALJ's decision (October 7, 2020). (R. 25).

## V.   Analysis

Mesa raises multiple arguments in support of reversal. [ECF No. 23]. First, Mesa argues that the Social Security Administration's ("SSA") structure is unconstitutional which "deprived [her] of a valid administrative adjudicatory process." [ECF No. 20].

Next, Mesa claims that the testimony of the Vocational Expert ("VE") does not constitute substantial evidence upon which the ALJ could rely. *Id.* Mesa advances this argument via numerous alleged deficiencies in the VE's testimony, which can be summarized as follows: (1) the VE overstated the availability of produce weigher and cleaner & polisher jobs in the national economy; and (2) the ALJ's RFC restrictions are inconsistent with the purported requirements of the suggested jobs because: (a) all three jobs require the employee to "perform repetitive or short cycle work" which Mesa claims is inconsistent with the ALJ's "no production requirements" restriction; (b) two of the

jobs require the employee to have the temperament to "attain precise set limits, tolerances, and standards," which Mesa claims is also inconsistent with the ALJ's "no production requirements" restriction; (c) the DOT description of produce weigher, which requires the employee to "weigh produce selected by customer in self-service store" runs afoul of the ALJ's "no public interaction" limitation; and (d) data within the Occupational Requirements Survey ("ORS") indicates that the responsibilities of a marker are inconsistent with Mesa's RFC limitations.

In Mesa's final argument, she claims that the ALJ did not properly consider the opinion evidence of Dr. Beatriz Cabrera and Dr. Arlene Lopez.

For the reasons discussed below, the Undersigned rejects Mesa's arguments.

A.   ***Even if the Structure of the Social Security Administration was Unconstitutional, Mesa is Not Entitled to Relief***

Mesa's initial motion briefly touches on the constitutional issue and much of her argument comes from her response to the Commissioner's motion. [ECF Nos. 20; 27]. In Mesa's initial motion, she focuses on two recent Supreme Court cases she claims validate her position: *Selia Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020) and *Carr v. Saul*, 141 S. Ct. 1352 (2021). These cases offer little more than establishing the unconstitutionality of the SSA's removal provision and that Mesa is permitted to raise the issue as a basis for remand. Neither decision offers insight as to whether remand is appropriate in Mesa's specific situation.

In *Selia Law LLC*, the Supreme Court held "that the CFPB's leadership by a single

individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." 140 S. Ct. at 2192. Mesa argues that the SSA's structure suffers from the same constitutional defect as the CFPB because "[t]he Commissioner of [the] SSA is the singular head of the Agency, serves for six years, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." [ECF No. 20 (citing 42 U.S.C. § 902(a)(3)]. This claim is not in dispute, as the Commissioner "agrees that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." [ECF No. 25 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OLC Op.")].

In *Carr*, the Supreme Court held that a claimant need not raise a constitutional challenge at the agency level to bring it before the district court on appeal -- i.e., there is no issue exhaustion requirement, and the Commissioner may not rely on forfeiture to defeat a constitutional claim. 141 S. Ct. at 1362. Again, the Commissioner does not dispute this principle.

Instead, the Commissioner directs the Court's attention to *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which she claims establishes the principle that "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually **caused her harm**." (emphasis added) [ECF No. 25]. This is a burden the Commissioner argues Mesa is unable to meet because, in her

view, "[Mesa] has sustained no such harm." *Id.*

The Commissioner also relies on additional legal doctrines, including "harmless error, *de facto* officer, and the rule of necessity, as well as broad prudential considerations" as reinforcement for her position that *Collins* requires this Court to reject Mesa's request for relief. *Id.* Mesa disputes the Commissioner's interpretation of *Collins* and claims that these other doctrines "do not support the agency's position whatsoever" and "actually tend to 'reinforce' why [she] . . . should be accorded some remedy." [ECF No. 27].

The Commissioner has the better argument. Neither side disputes whether the SSA's removal provision is unconstitutional or whether Mesa has standing to bring her claim, which leaves the only area of dispute as whether Mesa must show that the "unconstitutional provision . . . inflict[ed] compensable harm." *Collins*, 141 S. Ct. 1789.

Mesa's first argument on this element is circular: she claims that her injury is a "constitutionally invalid" hearing and adjudication at the administrative hearing and appeals phase of the administrative process. [ECF No. 27]. Phrased differently, Mesa attempts to remove the "infliction" -- i.e., causation -- requirement by arguing that the unconstitutionality of the removal provision creates a *per se* injury for any claimant who received an unfavorable decision. As a fallback argument, Mesa claims that she can establish causation, if necessary. Both of Mesa's contentions are unconvincing.

In support of her position that she need not establish causation, Mesa describes this case as one "which involves government actors exercising power which they did not

lawfully possess." [ECF No. 27]. She then claims that in such a situation, a plaintiff is not required to establish the type of causation the Commissioner says is necessary. Mesa offers *Collins* as support for her characterization of the instant case and the principle of law she says applies. Mesa's characterization of the case, however, conflates two distinct constitutional problems -- one of appointment (which is not at issue here) and one of removal (which is at issue).

Mesa's error is made apparent by any reasonable reading of *Collins*. Despite Mesa's near exclusive reliance on *Collins*, the Supreme Court's reasoning unequivocally rejects her interpretation of its holding.

In the page immediately preceding the language from *Collins* upon which Mesa relies, the Supreme Court describes why, in a situation involving an unconstitutional removal provision -- the exact situation currently before the Undersigned -- the actions of the agency and the directors are not automatically void or illegal:

> [T]he shareholders' argument [that the actions of the Directors protected by an unconstitutional removal restriction must be voided] is neither logical nor supported by precedent. All the officers who headed the FHFA during the time in question were properly appointed. Although the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Collins*, 141 S. Ct. at 1787.

In yet another direct rejection of Mesa's interpretation (and in a footnote on the

same page Mesa cites as support), *Collins* unquestionably legitimizes the powers of agency leaders *properly appointed* whose actions are questioned on only the unconstitutionality of a removal provision, stating that "[s]ettled precedent also confirms that the unlawfulness of the removal provision *does not* strip the Director of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207–11) (emphasis added).

Mesa adopts the same failed strategy used by the plaintiff in *Collins* and cites to cases assessing appointments clause issues, claiming that despite the difference the "reasoning is compelling." Like Mesa's other arguments, this one was also directly rejected by *Collins*. *Id.* at 1788 (rejecting the plaintiffs' reliance on cases decided on the issue of an appointments clause violation, and holding that, despite the existence of an unconstitutional removal clause, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office"). The Supreme Court was clear in distinguishing issues of appointment and issues of removal. In a concurring opinion, Justice Kagan noted that the Court's holding should not be read to undo the thousands of SSA decisions issued each year.[4]

---

[4]    Justice Kagan's *Collins* concurrence, joined by Justice Breyer and Justice Sotomayor, addresses the lack of impact the majority decision will have on agencies such as the SSA:

> [T]he majority's approach should help protect agency decisions that would never have risen to the President's notice. Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes

Adopting Mesa's *Collins* interpretation would require not only accepting that every unfavorable SSA decision issued during Saul's tenure must be remanded, but it would also render the harm requirement meaningless. This cannot be the case. If all that were required were the existence of an unconstitutional provision in place while an adjudicatory proceeding took place, then the Supreme Court would not have given the following guidance on circumstances when an unconstitutional removal provision could cause compensable harm:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a [Director] could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

---

> each year. The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block. Cf. *ante*, at ——, n. 21. But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense. "[P]residential control [does] not show itself in all, or even all important, regulation." Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2250 (2001). When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

141 S. Ct. at 1801.

*Id.* at 1788-89.

Accordingly, the Undersigned rejects Mesa's claim that she is not required to establish harm.

As an alternative argument, Mesa also takes the position that she is able to establish harm, if necessary. As her evidence on this point, Mesa alleges only a single fact unique to her case, which focuses on the timing of her appeals council decision. Apart from the timing issue, she points to no decision, regulation, or administrative action that directly impacted her case other than her general claim that there was an unlawful delegation of authority to the ALJ and appeals council because of the unconstitutional removal restriction.

This near-complete lack of case-specific analysis reveals that Mesa's causation argument is merely a repurposing of her earlier argument that the unconstitutional provision creates a *per se* right to a new hearing. The only difference between these two arguments is Mesa's inclusion of the phrase "but for."

In this section of her response, Mesa begins by repeating her described-above circular argument, adds the words "but for" as a conjunctive connector, and claims that "[i]t is impossible to have a more direct 'but for' proof of causation than this." This hyperbolic claim again disregards the Supreme Court's unequivocal holding that an unconstitutional removal provision does not strip the agency head "of the power to undertake the other responsibilities of his office[,]" *Collins*, 141 S. Ct. at 1788 n.23 -- which,

here, includes the power to adjudicate social security claims like Mesa's.

Mesa makes a secondary request that the case be, at a minimum, remanded to the appeals council for reconsideration. She offers two unique arguments in support of this request. First, she alleges that the Commissioner has conceded the issue by not directly addressing the argument in her response. Second, she contends that the facts of this case are akin to the causation hypothetical provided in *Collins*. Neither argument is persuasive.

In Mesa's initial motion, she devotes approximately two-and-a-half pages to her constitutional argument. Of that two-and-a-half pages, she devotes two sentences to the appeals council claim, alleging that, "the ALJ decided this case under regulations promulgated by Mr. Saul when Mr. Saul had no constitutional authority to issue those rules" and because this also applies to the appeals council, "a presumptively inaccurate legal standard was utilized to adjudicate this disability claim at the administrative level." [ECF No. 20]. Phrased differently, Mesa states all of her arguments about the illegality of the ALJ's decision applies equally to the appeals council's decision.

In her initial motion, Mesa made no argument unique to the appeals council process. Thus, when the Commissioner responded to Mesa's arguments -- which she alleges apply to both stages of the proceedings -- she sufficiently addressed Mesa's appeal's council claims. Accordingly, the Commissioner has not forfeited the issue by not including a specific catch-all phrase stating that her arguments also applied to the appeals

council proceedings.

In her only attempt to raise a more-case-specific causation argument, Mesa notes that the appeals council's review of the ALJ's decision occurred after Joe Biden became the President of the United States. In her view, President Biden would have removed Saul before her appeals council decision was issued but for the fact that he believed that the removal provision prevented the action. In support of this theory, she points to two facts.

First, she notes that the White House sought guidance from the Office of Legal Counsel about "whether President Biden could fire Commissioner Saul after the Supreme Court issued its decision in *Collins*." [ECF No. 27 (citing OLC Opinion)]. Second, Mesa offers the following statement by a White House official made shortly after President Biden terminated Saul:

> Since taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, terminated the agency's telework policy that was utilized by up to 25 percent of the agency's workforce, not repaired SSA's relationships with relevant Federal employee unions including in the context of COVID-19 workplace safety planning, reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda.

[ECF No. 27 (citing Biden fires Saul as SSA commissioner, Federal News Network, Nicole Ogrysko, available at https://federalnewsnetwork.com/people/2021/07/ biden-fires-saul-as-ssa-commissioner/)].

Here, Mesa is comparing this situation to the Supreme Court's example of a President who has expressed displeasure with an agency head and publicly indicated

that he would remove the agency head were it not for the statute. Finding such an equivalence, however, requires too many inferential leaps.

To begin, this statement was not made by the President; it was made by a White House official, which diminishes its import. Second, the statement made no mention of a previous belief that the statute prohibited Saul's removal. Lastly, because President Biden assumed office on January 20, 2021 and Mesa's appeals council decision was issued on January 22, 2021, it requires the Court to assume that removing Saul was one of the first tasks on President Biden's agenda.[5]

In addition to failing for a lack of factual support, Mesa's argument also suffers from a complete lack of legal support. "A party's failure to cite legal authority in support of its position 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Goldberg for Jay Peak, Inc. v. Raymond James Fin.*, Inc., No. 16-21831-CIV, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017) (quoting *Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)).

While there is always the possibility that the lack of legal authority is the product of the issue being one of first impression, that is not the case here. Mesa's lack of legal

---

[5]     Other actions by President Biden justify not making this assumption. For example, President Biden allowed former United States Attorney for the Southern District of Florida Ariana Fajardo Orshan to remain in office until she resigned on March 27, 2021. *See* Statement of United States Attorney Ariana Fajardo Orshan Following Resignation, March 26, 2021, available at https://www.justice.gov/usao-sdfl/pr/statement-united-states-attorney-ariana-fajardo-orshan-following-resignation.

authority is not due to a dearth of decisions addressing this issue; rather, it is because the decisions addressing her argument have overwhelmingly **rejected** it. *See, e.g., Rivera-Herrera v. Kijakazi*, No. 1:20-CV-01326-GSA, 2021 WL 5450230, at *8 (E.D. Cal. Nov. 22, 2021) (rejecting argument that causation is established because of the statements by the White House about Saul); *Kathy R. v. Kijakazi*, No. 2:21-CV-00095-JDL, 2022 WL 42916, at *4 (D. Me. Jan. 5, 2022), report and recommendation adopted, No. 2:21-CV-00095-JDL, 2022 WL 558359 (D. Me. Feb. 24, 2022) (same); *Brian S. L. v. Kijakazi*, No. 121CV00423AJTJFA, 2021 WL 6774946, at *23 (E.D. Va. Dec. 10, 2021), report and recommendation adopted, No. 121CV423AJTJFA, 2022 WL 303301 (E.D. Va. Feb. 1, 2022) (same); *Shaun A. v. Comm'r of Soc. Sec.*, No. C21-5003-SKV, 2021 WL 5446878, at *5 (W.D. Wash. Nov. 22, 2021) (same).[6]

In conclusion, Mesa's argument is devoid of any evidence demonstrating a causal link between the removal provision at issue and her unfavorable decision in front of the ALJ or the appeals council. She has made no effort to identify with particularity any error

---

[6]    These are examples only of decisions that predate the filing of Mesa's Response. There have been additional decisions issued since Mesa filed her response and they also uniformly reject Mesa's argument on this issue. *See, e.g., Tucker v. Kijakazi*, No. 21-60943, 2022 WL 742744, at *2 (S.D. Fla. Mar. 11, 2022) (rejecting argument that the plaintiff was entitled to remand because President Biden would have terminated Saul sooner had he believed that he could); *Scott E. v. Kijakazi*, No. 1:21-CV-00110-JAW, 2022 WL 669687, at *5 (D. Me. Mar. 6, 2022), report and recommendation adopted, No. 1:21-CV-00110-JAW, 2022 WL 1026988 (D. Me. Apr. 6, 2022) (same); *O'Leary v. Kijakazi*, No. 2:21-CV-00889-CSD, 2022 WL 820015, at *10 (D. Nev. Mar. 18, 2022) (same, but reversing on other grounds).

in her hearing that is attributable to some action or decision taken by Saul. Nor has she

presented any evidence, if she were able to establish error (which she has not), that the

error was allowed to occur only because the President was improperly unable to remove

Saul because of the unconstitutional removal restriction.[7]

For these reasons, the Undersigned respectfully recommends that the District

Court deny Mesa's request for relief on this ground.

**B.**    ***The VE's Testimony Constituted Substantial Evidence Upon Which the ALJ Could Rely***

VEs are used by ALJs to determine if sufficient jobs exist in the national economy

that the claimant can adjust to and perform. *Phillips*, 357 F.3d at 1240.

> A vocational expert is an expert on the kinds of jobs an individual can
> perform based on his or her capacity and impairments. When the ALJ uses
> a vocational expert, the ALJ will pose hypothetical question(s) to the
> vocational expert to establish whether someone with the limitations that the
> ALJ has previously determined that the claimant has will be able to secure
> employment in the national economy.

*Id.* An ALJ may rely solely on the testimony of a VE to make a step five determination

that a claimant has the ability to find work in the national economy. *Mabrey v. Acting*

*Comm'r of Soc. Sec. Admin.*, 724 F. App'x 726, 730 (11th Cir. 2018).

Mesa alleges five flaws in the VE's testimony: (1) the VE overstated the number of

---

[7]    Because Mesa has failed to establish that she is entitled to relief under *Collins*, the
Undersigned declines to address the Commissioner's other arguments (i.e., the ALJ's
appointment by an Acting Commissioner, harmless error, *de facto* officer doctrine, rule of
necessity, and broad prudential considerations) made in support of a ruling denying
Mesa's summary judgment motion.

produce weigher and cleaner & polisher jobs in the national economy; (2) all three jobs require the ability to "perform repetitive or short cycle work," which is inconsistent with Mesa's restriction of "no production requirements"; (3) two of the jobs require that Mesa have the temperament to "attain precise set limits, tolerances, and standards," which is also inconsistent with the "no production" restriction; (4) a produce weigher job requires significant interaction with the public, which is inconsistent with the RFC's "no public interaction" limitation; and (5) ORS data on the marker job indicates it is inconsistent with Mesa's limitations.

1. The VE's Testimony About the Number of Produce Weigher and Cleaner and Polisher Jobs Constitutes Substantial Evidence Upon Which the ALJ Could Rely

Mesa claims that the data presented by the VE regarding the availability of produce weigher and cleaner & polisher jobs in the national economy is substantially overstated. In support of this, Mesa details her *post-hearing* research into the job data discussed by the VE. She continues by positing her own theories, suggestions, and possible interpretations, and ultimately concludes that the VE, using unverified methodology, substantially overstated the number of produce weigher and cleaner & polisher jobs in the national economy. [ECF No. 20].

"The Social Security Regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE produce detailed reports or statistics in support of her testimony." *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839

(11th Cir. 2012). Based on his knowledge and expertise, a "VE's testimony is therefore substantial evidence, as it is relevant evidence that a reasonable person would accept as adequate to support the conclusion that there is work available in significant numbers in the national economy that [the Claimant] is able to perform." *Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926 (11th Cir. 2010).

"[The Eleventh Circuit] has not placed an affirmative duty on the ALJ to independently investigate a conflict between the VE's testimony and job availability figures provided by the Bureau of Labor Statistics in the [Occupational Employment Statistics]." *Webster*, 773 F. App'x at 556. Thus, even when a VE's job numbers conflict with the job numbers provided by the Bureau of Labor Statistics, an ALJ has no duty to investigate or resolve this conflict.

For a situation like this, the analysis in *Davis v. Berryhill*, No. 17-cv-293-N, 2018 WL 2208432 (S.D. Ala. May 14, 2018) is instructive. In *Davis*, the claimant raised (for the first time) in her motion before the district court, statistics from "SkillTran" and an argument that the Occupational Employment Statistics group contained multiple DOT codes, not just the one for the job described by the VE. In denying the claimant relief, the *Davis* court noted:

> The only testimony regarding the source of the vocation expert's numbers is the following exchange:
>
> ALJ: And is your testimony consistent with the Dictionary of Occupational Titles?

VE: With the exception of the reduction in numbers and that's based on my experience and familiarity with those types of jobs.

*Id.* at \*6.

Here, like the claimant in *Davis*, Mesa did not ask any questions of the VE about his method of calculation or the data upon which he was relying. Instead, Mesa's inquiries for the VE only revolved around changing the hypothetical individual's conditions and abilities.

This can be contrasted by the actions of the claimant in *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277 (11th Cir. 2020). Unlike the claimant's actions here, the claimant in *Goode* cross-examined the VE at length:

> The record shows that Ms. Goode's attorney repeatedly questioned the vocational expert regarding his flawed testimony, expressing multiple times to the ALJ that he did not find the testimony persuasive or credible and was trying to get "specifics." Moreover, after several attempts to get an answer from the vocational expert, the ALJ intervened and urged the attorney to move on. This is not a case in which the claimant failed to challenge or question the vocational expert's methodology or job numbers. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1110 (9th Cir. 2017) ("It is enough to raise the job numbers issue in a general sense before the ALJ. A claimant may do so by inquiring as to the evidentiary basis for a [vocational expert's] estimated job numbers[.]").

*Goode*, 966 F.3d at 1284 n.3.

The VE is not required to give statistics in support of his testimony and an ALJ may make factual findings based on only the VE's testimony. *Bryant*, 451 F. App'x 838, 839. Mesa is now asking the Undersigned to find fault with the ALJ's factual determinations because she believes the VE's testimony is false.

In assessing the ALJ's factual findings, the Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (some alterations in original). Despite this, Mesa argues that this Court should replace the VE's unimpeached and uncontradicted testimony with her own substituted research and speculation. To advance her position, she uses, as an example, an application of the "equal distribution method" to determine how many jobs exist for each of the DOT Codes which fall under the same Standard Occupational Classification ("SOC") as produce weigher and cleaner & polisher.

However, *Chavez v. Berryhill*, one of the cases upon which Mesa's argument rests, criticizes this method as "illogical" because its premise requires "an assumption about the relative distribution of jobs within a broader group that lacks any empirical footing." 895 F.3d 962, 966, 969-70 (7th Cir. 2018). With no empirical backing, it is also hypothetically possible that the VE vastly understated the number of available jobs and that each of the other DOT occupations in produce weigher's or cleaner & polisher's SOC grouping has only one available job and the "produce weigher" positions account for 57,928 available jobs and the "cleaner & polisher" positions account for 238,788 available jobs (two numbers which are well above those given by the VE).

As the Eleventh Circuit has stated: "We review only whether the ALJ's decision was supported by substantial evidence, and 'we will look only to the evidence actually

presented to the ALJ.'" *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009–10 (11th Cir. 2020) (quoting *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998)). In *Valdez*, the Eleventh Circuit rejected the very argument Mesa is advancing and refused to consider post-hearing data in an attack on the VE's testimony about job availability. *Id.* at 1009.

A Court's review of an ALJ's decision is limited. The Court may not substitute its judgment for that of the ALJ. Nor is it appropriate to substitute Mesa's post-hearing speculation for the VE's uncontroverted testimony. The VE's expertise was stipulated to by Mesa at the hearing and his testimony constitutes substantial evidence upon which the ALJ could rely.

2. There is no conflict between the attributes of the jobs provided and the ALJ's restrictions to "no production requirements" and "no public interaction"

Mesa argues that the ALJ's RFC limitation to "no production requirements" and "no public interaction" conflicts with the VE's testimony that Mesa can perform any of the three provided jobs. This, she argues, necessitates reversal because, due to this conflict, the VE's testimony no longer constitutes "substantial evidence."

In support of her production requirement argument, Mesa directs the Court's attention to the temperament requirement for each of the jobs, which is identical and requires the "R" temperament to "perform repetitive or short cycle work." [ECF No. 20]. This, in Mesa's opinion, means these are "inherently production-type jobs that require the worker to maintain his pace consistently throughout the day." *Id.* She claims this

position is corroborated by the SCO's reference[8] to a publication titled "The Revised Handbook for Analyzing Jobs" (the "RHAJ"). The "RHAJ" expands on the "R" temperament as follows: "Involvement performing a few routine and uninvolved tasks over and over again according to set procedures, sequence, or pace with little opportunity for diversion or interruption. Interaction with people is included when it is routine, continual, or prescribed."

Mesa cites no case, statute, or regulation in support of her expansive definition of the "production requirement" to include all jobs requiring an "R" temperament.

Mesa next claims that two of the jobs, produce weigher and marker, both also require a "T" temperament to "attain precise set limits, tolerances, and standards." She again directs the Court's attention to the RHAJ, which provides the following explanation for the "T" temperament: "Involves adhering to and achieving exact levels of performance, using precision measuring instruments, tools, and machines to attain precise dimensions; preparing exact verbal and numerical records; and complying with precise instruments and specifications for materials, methods, procedures, and techniques to attain specified standards."

Mesa cites only a single case in support of her position that this definition necessarily precludes production work. She claims that *Sandra H. v. Comm'r of Soc. Sec.*,

---

[8] Mesa concedes that the SCO has not incorporated the RHAJ's definitions into its own.

No. 17-cv-403, 2019 WL 289811 (E.D. Wash. Jan 22, 2019) interpreted the "T" temperament as "barring fast-paced or production-quota work." This case is not persuasive because a careful review reveals that the court's alleged interpretation was based on a *concession* by the defendant in the context of arguing that the two other jobs definitively do not run afoul of the RFC's restrictions, not on any independent analysis of the temperament.

In the Commissioner's view, the Court should reject Mesa's arguments because they are merely "an attempt to manufacture an apparent conflict when, in fact, no conflict exists." [ECF No. 25]. The Commissioner alleges that Mesa's arguments are "nothing more than her personal opinion" that the "R" and "T" temperaments conflict with the production requirements.

To begin, the Undersigned will assess whether the ALJ was required to identify any conflicts allegedly created by the RHAJ's expansive definitions. As the sole case supporting her argument that the ALJ erred in not resolving these purported conflicts, Mesa cites *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018). *Washington* and its progeny establish the following relevant legal principles:

In *Washington*, the Eleventh Circuit concluded that under SSR 00-4p, "the ALJs within the SSA have an affirmative duty to identify apparent conflicts between the testimony of a Vocational Expert *and the DOT* [the Dictionary of Occupational Titles, an authoritative publication by the DOL] and resolve them." *Washington*, 906 F.3d at 1356 (emphasis added).

Once an apparent conflict has been identified, the ALJ must "offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict." *Id.* A "failure to discharge this duty means that the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence." *Id.*

An "apparent conflict" is

more than just a conflict that is made apparent by the express testimony of the VE. It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case.

*Id.* at 1365.

In *Washington*, the conflict was "apparent" when the ALJ questioned the VE about available jobs for an individual capable of only occasional fingering. *Id*. The VE provided two jobs, which, under the DOT, required "frequent fingering." *Id*. Remand was appropriate because the ALJ's ruling failed to identify and resolve this apparent conflict, which was in violation of SSR 00-4p. *Id*.

To contrast, when there is no "apparent conflict," the ALJ has nothing to "identify, explain and resolve." *Washington*, 906 F.3d at 1356. In *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021), the Eleventh Circuit held there is no apparent conflict between the terms "detailed but uninvolved" and "simple" when referring to instructional limitations. "Although there is potentially tension between [] simple instructions and [detailed but uninvolved instructions], that tension does not rise to the

level of 'apparent' conflict as [the Eleventh Circuit has] defined it." *Id.* at 1323 (citing *Washington*, 906 F.3d at 1366 (defining "apparent" as "reasonably ascertainable or evident")).

To comply with this standard, an ALJ is required to resolve conflicts only "between the VE's testimony and the DOT." *Webster v. Comm'r of Soc. Sec.*, 773 F. App'x 553, 555 (11th Cir. 2019). Mesa has not identified any competing authority burdening the ALJ with an independent, affirmative duty to resolve all possible internal inconsistencies in the VE's testimony. Further, the Eleventh Circuit has stated "'[a]pparent' means 'apparent to an ALJ who has ready access to and a close familiarity with the DOT.'" *Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315, 318 (11th Cir. 2021) (quoting *Washington*, 906 F.3d at 1366). Apparent conflicts must be "reasonably ascertainable or evident." *Id.* Both principles indicate that an ALJ is not required to identify all potential conflicts that may exist.

Indeed, an ALJ is not even expected to resolve every conflict that might exist within the various publications, studies, or guides produced or commissioned by the Department of Labor. *See Camden v. Colvin*, No. SKG-13-1533, 2014 WL 2964992, at *4 (D. Me. June 26, 2014) (finding the ALJ was not required to address conflicts between VE and the RHAJ); *Gaspard v. Comm'r Soc. Sec. Admin.*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009) ("But in the absence of proof that the Commissioner takes administrative notice of RHAJ information, or otherwise embraces it as authoritative, the court cannot connect the dots in such a way as to conclude that a RHAJ-based conflict runs afoul of either circuit law or

Soc. Sec. R. 00–4 . . . .").

Having determined that the ALJ was not required to address any purported conflicts between the VE's testimony and any RHAJ, the Undersigned next turns to whether there was an apparent conflict between the ALJ's restriction to "no production requirements" and the "R" or "T" temperament as defined by the DOT. Cases throughout the country have rejected this argument. *See, e.g., Wuthrich v. Comm'r of Soc. Sec.*, No. 2:17-CV-261-FTM-99CM, 2018 WL 4760796, at *15 (M.D. Fla. July 28, 2018), report and recommendation adopted, No. 2:17-CV-261-FTM-99CM, 2018 WL 4357133 (M.D. Fla. Sept. 13, 2018) ("[T]he Court notes the DOT titles for each of the four jobs [containing "R" or "T" temperament codes] contain no references to temperament codes or a production rate/pace work requirement."); *Stephanie Beth D. v. Kijakazi*, No. CV 20-2622-JWL, 2022 WL 1136192, at *8 (D. Kan. Apr. 18, 2022) (rejecting the plaintiff's argument about "T" temperaments, finding that the DOT "does not explain the meaning of the phrase or suggest that it relates in any way to fast-paced production requirements"); *Gray v. Comm'r of Soc. Sec.*, No. 217CV529OCJESPRL, 2019 WL 2210677, at *7 (M.D. Fla. Feb. 1, 2019), report and recommendation adopted, No. 217CV529FTM29PRL, 2019 WL 1198967 (M.D. Fla. Mar. 14, 2019) ("[The] [p]laintiff offers no support for her inferential leap that ["R" and "T" temperaments] necessarily include fast paced or high production work goals, as distinguished from set procedures, pace or limits.").

In each of these cases, the court rejected arguments identical to Mesa's because the

court determined that the conflict either did not exist or was not apparent. The Undersigned finds this reasoning persuasive. Mesa's argument requires an inferential leap that the law does not require ALJs to make when assessing conflicts. An ALJ is required to identify only apparent conflicts and Mesa has not shown that any apparent conflict exists.

Mesa next claims that the produce weigher job requires duties violative of Mesa's limitation to "no public interaction." She bases this on the DOT's list of produce weigher duties, which include "[w]eigh[ing] produce selected by customer in self-service store." [ECF No. 20]; *see also* 299.587-010 Produce Weigher, DICOT 299.587-010. As explained below, this isolated statement does not create an apparent conflict and, even if it does, any error is harmless.

The Commissioner alleges in her response that Mesa fails to include pertinent sections of the DOT's produce weigher description. For example, the Commissioner notes that "People: 8-Taking Instructions-Helping" is "not significant" for a produce weigher and that the job also requires no "talking" or "hearing" which negates any claim that the role requires interaction with the public. The Undersigned agrees. The mere fact that a produce weigher is weighing produce *selected* by the public does not mean that the produce weigher is actually interacting with the public.

However, even if this were an apparent error the ALJ was required to identify, the error would be harmless. Produce weigher accounts for only 13,000 of the 319,800

available jobs. Courts regularly affirm an ALJ's finding that sufficient jobs exist based on numbers less than those that exist here. *See e.g., Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (upholding an ALJ's finding that jobs that the claimant could perform existed in significant numbers based on a vocational expert's testimony that 80,000 jobs existed nationwide); *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1010 (11th Cir. 2020) (78,000 jobs is a sufficient number to support an ALJ's finding at step five); *but see Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1317 (11th Cir. 2021) (remanding case to ALJ to assess whether 21,000 jobs were sufficient after 104,000 of 135,000 possible jobs were eliminated).

In Mesa's final conflict allegation, she claims that the RFC restriction to "no production requirements" and "no public interaction" precludes her from working as a marker. Mesa bases this claim on data from the Occupational Requirements Survey ("ORS") which indicates that the marker job requires "the heavy presence of a supervisor (91.1 percent)[;] the majority of workers performing this job have an inability to pause work (63.2 percent)[; and] 90 percent of workers are required to have basic people skills, and over 70 percent of workers are required to have interaction with the public." [ECF No. 20].

The Undersigned agrees with the Commissioner that this cannot serve as a basis for remand because Mesa did not confront the VE with this data during the hearing. For the same reasons Mesa's post-hearing SkillTran research is unpersuasive, so too is her

post-hearing speculation based on the ORS. *See Wilks v. Saul*, No. 1:19-cv-00306-MR-WCM, 2020 WL 5235335, at *4 (W.D.N.C. Sept. 2, 2020) (finding ALJ was not required to address conflicts between VE testimony and the plaintiff's ORS evidence raised in post-hearing objections because an ALJ need not resolve any apparent conflicts between a VE's testimony and publications other than the DOT) ; *Roderick L. S. G. v. Saul*, No. CV 20-5727-RAO, 2021 WL 2590159, at *7 ( C.D. Cal. June 24, 2021) ("[T]he ALJ is not required to reconcile conflicts between the VE's testimony and non-DOT sources, such as the ORS or O*NET OnLine." (citing *Shaibi v. Berryhill*, 883 F.3d 1102, 1109-10 (9th Cir. 2017))).

Accordingly, the VE's testimony constitutes substantial evidence upon which the ALJ could rely.

### C. *The ALJ Did Not Inappropriately Discount Dr. Cabrera's and Dr. Lopez's Opinions*

Mesa argues that the ALJ erred by failing to properly assess the opinions of Dr. Cabrera and Dr. Lopez. The Undersigned disagrees with this assessment and finds that the ALJ appropriately evaluated the medical evidence in Mesa's case.

Because Mesa applied for benefits after March 27, 2017, the ALJ applied a new set of regulations for evaluating medical opinions and prior administrative medical findings, as set forth in 20 C.F.R. § 416.920c. The new regulations characterize evidence from Federal and State agency medical and psychological consultants as "prior administrative medical findings," instead of as medical opinions. 20 C.F.R. § 416.913(a)(5).

As a preliminary matter, under the new regulations, the SSA "will not defer or

give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). In evaluating medical opinions and prior administrative medical findings, the SSA considers several factors, prioritizing (c)(1), supportability, and (c)(2), consistency, when assessing the persuasiveness of any given medical opinion. 20 C.F.R. § 416.920c(a).

Mesa's arguments are similar as to each doctor's opinion. In essence, Mesa contends that the ALJ ignored or failed to consider what she believes are important findings within both doctors' reports and, if the ALJ had given those findings the appropriate weight, then he would have assigned a more-restrictive RFC to Mesa and realized she could not perform other work in the national economy.

In assessing the medical evidence, the ALJ found Dr. Cabrera's findings to be "partially persuasive." Before making this assessment, the ALJ provided the general results of the singular memory assessment performed by Dr. Cabrera. He noted that Dr. Cabrera concluded that Mesa's ability to recall information and the interval between immediate and delayed recall could benefit from time for consolidation, and that Mesa displayed a higher-than-expected rate of forgetting. Ultimately, he found this information only partially persuasive because "it fail[ed] to specify the degree of limitation, if any, that [Mesa's] mental health condition causes in areas of mental functioning . . . ." (R. 23).

The ALJ found Dr. Lopez's opinions to be "generally persuasive." Specifically, she noted that Dr. Lopez "concluded that it is possible for the claimant to perform well in a job that does not emphasize speedy task completion and is more verbally-mediated." *Id.* She further found that the opinion is generally consistent with Mesa's documented mental health conditions and issues with understanding and concentration.

The findings that Mesa identifies are, at most, merely more-detailed descriptions of the information included in the ALJ's decision. For example, Mesa complains that the ALJ should have considered the fact that Mesa's auditory memory capacity is in the low average range, and she performed in the extremely low range for visual memory capacity. [ECF No. 20]. This is consistent with the ALJ's acknowledgement that Mesa displayed a higher-than-expected rate of forgetting.

Likewise, Mesa complains that the ALJ did not include Dr. Lopez's findings that Mesa could benefit from setting feasible timelines for completion of work-related tasks, and by establishing clear priorities for completing these tasks. *Id.* This is consistent with the ALJ's acknowledgement that Mesa would perform well in a job that does not emphasize speedy task completion.

Even if Mesa had pointed to inconsistent findings, the ALJ's assessment of the doctors' findings is sufficient. *See Matos v. Saul*, No. 20-20615-CIV, 2021 WL 1092293, at *18 (S.D. Fla. Feb 19, 2021) (rejecting claimant's argument that ALJ relied on "benign" medical record findings to the exclusion of other relevant findings in finding a medical

opinion "not persuasive"); *Freeman v. Comm'r of Soc. Sec.*, No. 20-cv-2229, 2021 WL 5881676, at *7 (M.D. Fla. Dec. 13, 2021) (rejecting claimant's argument that ALJ substituted his opinion for a doctor's when he found doctor's opinion not persuasive because it was not supported by objective medical evidence); *Welch v. Comm'r of Soc. Sec.*, No. 20-cv-1256, 2021 WL 5163228, at *4 (M.D. Fla. Nov. 5, 2021) (rejecting claimant's argument that ALJ erred in finding doctor's opinion not persuasive because ALJ applied the proper regulatory analysis).

An ALJ is not required to adopt every finding made by a doctor whose opinion is found to have any modicum of persuasiveness. *See, e.g., Sesler v. Comm'r of Soc. Sec.*, No. 8:20 -cv-2835-DNF, 2021 WL 5881678 at * 6 (M.D. Fla. Dec. 13, 2021) ("[A]n ALJ need not adopt every part of an opinion that the ALJ finds persuasive." (quoting *Misla v. Comm'r of Soc. Sec.*, No. 6:20-cv-1076-DCI, 2021 WL 2417084, at *2 (M.D. Fla. June 14, 2021))); *Breaux v. Kijakazi*, No. 20 -cv-21917-Altonaga/Goodman, Doc. 29 at 14, 17 (S.D. Fla. July 22, 2021) (explaining the "requirements within regulations 20 C.F.R. § 416.920c(a)-(b) do not compel an ALJ to adopt every part of an opinion that she finds persuasive into the RFC" and that the ALJ "was not required to adopt any particular limitation in her RFC determination merely because she found these opinions to be persuasive"), report and recommendation adopted, 2021 WL 3721547 (S.D. Fla. Aug. 23, 2021); *Duarte H. v. Comm'r of Soc. Sec.*, No. 1:20-cv-01491-CMS, Doc. 33 at 34 (N.D. Ga. Apr. 6, 2021) (acknowledging "ALJ is not required to adopt any doctor's opinion verbatim in making an RFC

assessment" in a case involving the new regulations); *Freyhagen v. Comm'r of Soc. Sec.*, No. 3:18 -cv-1108-J-MCR, 2019 WL 4686800, at *8 (M.D. Fla. Sept. 26, 2019) (acknowledging ALJ found an opinion persuasive under the new regulations but made a different finding about the severity of an impairment and explaining "the ALJ's RFC assessment did not need to match or mirror the findings or opinions of any particular medical source" because the ALJ is responsible for assessing the RFC).

In fact, an ALJ is not even required to address every finding made by a doctor in the doctor's evaluations. *See Adams v. Comm'r, Soc. Sec. Admin.*, 586 F. App'x 531, 534 (11th Cir. 2014) (citation omitted) (finding that the ALJ did not err by failing to specifically address a medical source's opinion regarding various limitations, as the ALJ's decision made clear that the ALJ considered both the medical source's opinion and the plaintiff's medical condition as a whole); *Dyer*, 395 F.3d at 1211  (citation omitted) (indicating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" as long as the decision is not a broad rejection, meaning not enough to enable the court to conclude that the ALJ considered a claimant's medical condition as a whole).

Because the ALJ properly listed the reasons that she considered these two doctors' opinions to be less than fully persuasive and because her decision is otherwise supported by substantial evidence, there is no basis for remand on this ground.

## VI.    Conclusion

The Undersigned **respectfully recommends** that the District Court **deny** Mesa's summary judgment motion, **grant** the Commissioner's summary judgment motion, and enter final judgment in favor of the Commissioner.

## VII.    Objections

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on May 11, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Robert N. Scola
All counsel of record

36